IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Marhaygue, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:12-cv-322-RMG-JDA |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Wolfpac Technologies, Inc.; Atlantic Forest Products, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Plaintiff's motion for preliminary injunction.  [Doc.

35.]  Pursuant to the provisions of Title 28, United States Code, Section 636 and Local

Rule 73.02(C)(7), D.S.C., this magistrate judge is authorized to review this pretrial motion

and submit findings and recommendations to the District Court.

## BACKGROUND

Plaintiff filed this action on February 2, 2012[1] [Doc. 2] and filed an Amended

Complaint on March 16, 2012, asserting claims of patent infringement, unfair competition

under federal law, interference with prospective advantage, and civil conspiracy [Doc. 34].

Plaintiff is the assignee of U.S. Patent No. 7,997,044 ("the '044 Patent"), issued August 16,

2011, which is directed to an *Enclosure and Method for Making an Enclosure*.  [Docs. 2-1,

5-3, 34-1.]  Specifically, with respect to this litigation, the '044 Patent is directed to the

construction of closed exterior trim, such as for columns, U.S. Patent No. 7,997,044 col.

---

[1] On the same day, Plaintiff also filed a motion for a temporary restraining order ("TRO").  [Doc. 5.]
This Court filed a Report and Recommendation on February 6, 2012, recommending the motion for a TRO
be denied because Plaintiff had not met the heavy burden to receive a TRO issued without notice to the
opposing party.  [Doc. 10 at 9–10.]  On February 21, 2012, the District Court adopted the Report and
Recommendation of February 6, 2012, but the District Court also considered Plaintiff's motion as a motion
for preliminary injunction and denied the motion.  [Doc. 28.]

1 ll. 13–15 (filed Aug. 16, 2011), a product Plaintiff refers to as the Column Wrap[2] [Doc. 35-1 at 2].  The '044 Patent has 19 claims; Claims 1, 2, 6, 13, 17, 18, and 19 are independent claims.  U.S. Patent No. 7,997,044 col. 5 l. 35–col. 8 l. 59.

### Preliminary Injunction Contentions

Plaintiff asserts its patent is valid [Doc. 35-1 at 9–11; Doc. 53 at 11–13] and alleges Defendants Wolfpac Technologies, Inc. ("Wolfpac") and Atlantic Forest Products, LLC ("Atlantic Forest"; collectively "Defendants") have made, used, offered for sale, and/or sold a product under the trademark VERSAWRAP™ that infringes at least Claims 17 and 19 of the '044 Patent [Doc. 35-1 at 11–16; Doc. 53 at 6–11].  Plaintiff also alleges it has been and will continue to be irreparably harmed by Defendants' activities; Plaintiff's alleged harms include loss of market share, price erosion, permanent customer losses, inability to establish a consistent and loyal customer base, and loss of business opportunities and reputation. [Doc. 35-1 at 16–25; Doc. 53 at 13–19.]  Finally, Plaintiff contends the balance of equities weighs in favor of Plaintiff and the public interest is served by enforcing the '044 Patent.  [Doc. 35-1 at 25–28; Doc. 53 at 19.]

Defendants contend the '044 Patent is invalid and seek a declaratory judgment to that effect.  [Doc. 45 at 19–20; Doc. 46 at 21–22; Doc. 44 at 13–15; Doc. 56 at 1–6.]  Defendants also argue the VERSAWRAP™ product does not infringe the '044 Patent because the VERSAWRAP™ product does not contain the claimed connector and does not contain the claimed beveled edges.  [Doc. 44 at 4–13; Doc. 56 at 6–8.]  Further, Defendants contend Plaintiff cannot establish that it is being irreparably harmed because

---

[2] Plaintiff's product is distributed under the trademark WRAP-N-SNAP®.  [Doc. 35 at 1.]

Plaintiff has failed to demonstrate it will suffer future harm that is not compensable through money damages. [Doc. 44 at 15–24; Doc. 56 at 8–13.] Lastly, Defendants argue Plaintiff has failed to demonstrate it will likely succeed on the merits with respect to infringement and validity, and thus, the balance of hardships tips away from the granting of a preliminary injunction, and the public interest would be better served by allowing Defendants to continue supplying the market with a competing non-infringing product. [Doc. 44 at 25; Doc. 56 at 13–14.]

## APPLICABLE LAW[3]

A preliminary injunction "protect[s] the status quo . . . to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litigation*, 333 F.3d 517, 525 (4th Cir. 2003). It is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Coucil, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)). To obtain a preliminary injunction, a plaintiff must show four elements:

    1)    he is likely to succeed on the merits,

    2)    he will suffer irreparable harm if the TRO or preliminary injunction is not granted,

    3)    the balance of equities favors him, and

---

[3] With respect to preliminary injunctions in patent cases, the substantive matters unique to patent law are governed by the law of the United States Court of Appeals for the Federal Circuit. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988). However, "purely procedural questions involving the grant of a preliminary injunction are controlled by the law of the appropriate regional circuit." *Id.* Therefore, the Court will apply Federal Circuit law with respect to substantive patent issues and Fourth Circuit law with respect to non-patent substantive issues and procedural issues.

4)    the TRO or injunction is in the public interest.

*Winter*, 555 U.S. at 20; *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–47 (4th Cir. 2009) (explaining how the *Winter* standard for preliminary injunctions is different from the standard previously applied in the Fourth Circuit), *judgment vacated and remanded*, 130 S. Ct. 2371 (2010), *in light of Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010).  The plaintiff must establish all four elements to receive injunctive relief.  *See Winter*, 555 U.S. at 20.

The United States Court of Appeals for the Fourth Circuit has explained that, under *Winter*, the Supreme Court requires "that the plaintiff make a clear showing that it will likely succeed on the merits at trial."  *Real Truth About Obama, Inc.*, 575 F.3d at 346 (citing *Winter*, 555 U.S. at 22–23).  Moreover, the party seeking the injunction must make a clear showing that it will likely suffer irreparable harm without an injunction.  *Id.* at 347 (citing *Winter*, 555 U.S. at 20–23).  Further, the Supreme Court in *Winter* emphasized the public interest requirement, *id.*, requiring courts to "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction,'" *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

## DISCUSSION

### Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a patentee must demonstrate (1) that it will likely prove the defendant is infringing one or more claims of the patent at issue and (2) that at least one of the allegedly infringed claims will also likely withstand validity challenges presented by the defendant.  *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042,

4

1050 (Fed. Cir. 2010) (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001)).  The Federal Circuit "views [a motion for a preliminary injunction] in light of the burdens and presumptions that will inhere at trial," *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009), but "the established test for injunctions . . . places the burden on the plaintiff to prove likelihood of success," *id.* at 1380.  "A preliminary injunction should not issue if an alleged infringer raises a substantial question regarding either infringement or validity, i.e., the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown lacks substantial merit." *AstraZeneca*, 633 F.3d at 1050 (citing *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

Before it can determine whether the defendant is infringing the patent at issue or the patent is invalid, a court must construe the claims at issue, giving the claims the same meaning for purposes of both the infringement and validity analyses.[4]  *Amazon.com*, 239 F.3d at 1351 ("Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method, or whether the prior art anticipates and/or renders obvious the claimed invention. . . . Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.").  Claim construction is a question of law and involves determining what the language of the claim means.

---

[4] Claim construction is an important step in the court's analysis because "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *see also* 35 U.S.C. § 112 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.").

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Courts generally use three sources to determine the meaning of the claim terms: the claims themselves, the specification, and the prosecution history—these sources are the intrinsic evidence of a claim's meaning. *Id.* (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)). A court may also consider extrinsic evidence, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles, but "[o]nly if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

Here, Plaintiff argues the terms of the allegedly infringed claims are unambiguous and should be given their plain and ordinary meaning [Doc. 35-1 at 12; Doc. 53 at 6–7], but Defendants argued at a hearing before the Court that the terms swage fit, snap fit, and frictional fit require construction because they are not well-understood terms of art [*see* Doc. 56 at 7 n.4 (stating "substantial claim interpretation issues" have been raised in this case)]. Defendants also argue that, for purposes of the '044 Patent, Plaintiff equated the terms swage fit, snap fit, and frictional fit [Doc. 44 at 9]; Plaintiffs agreed with this proposition at the hearing before the Court to the extent that these terms all suggest some sort of frictional fit.

Upon review of the parties' arguments and the '044 Patent, the Court concludes a person having ordinary skill in the art would (1) recognize that the terms snap fit, swage fit, and frictional fit as used in the '044 Patent describe the same type of mechanical closure—requiring a frictional fit—and (2) understand and apply the plain, ordinary meaning of these

terms.[5]  Thus, no claim construction is required;[6] the Court will employ the plain, ordinary meaning of the claim terms in evaluating the likelihood of Plaintiff's success on the merits of its infringement claim and Defendants' validity defense.

### Infringement

To determine if the defendant is infringing the patent, after construing the disputed claim terms, the court compares the properly construed claims to the allegedly infringing device.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998).  To be infringing, the defendant's device must contain every limitation, or an equivalent limitation, of the allegedly infringed claims, *see Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997), which is a question of fact, *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

Here, Defendants contend the VERSAWRAP™ product does not contain the limitations of Claims 17 and 19 that require a certain connector and beveled edges.  [Doc. 44 at 4–13; Doc. 56 at 6–8.]  Specifically, Defendants argue the VERSAWRAP™ product utilizes a tongue and miter joint, which is not the same as the snap fit, swage fit, or friction fit joint described in the '044 Patent [Doc. 44 at 4–9], and the VERSAWRAP™ product's "interior surfaces are joined not by a 45º V-shaped notch, but rather by a distinct joint" [*id.*

---

[5] With respect to the plain, ordinary meaning of the claim terms, the term "swage" can apply to the process of swaging or to a die or tool used for swaging.  Swaging is a forging process in which the dimensions of an item are altered by forcing the item into a die or dies.  Swaging, http://en.wikipedia.org/wiki/Swaging (last visited May 7, 2012).  A friction fit is a fastening between two parts achieved by friction, rather than any other means of fastening, after the parts are pushed together.  Interference fit, http://en.wikipedia.org/wiki/Interference_fit (last visited May 7, 2012).

[6] That is, no construction of the terms swage fit and friction fit is required, and the parties have failed to identify other claim terms that may require construction.

at 10].  As to Defendants' argument with respect to the claimed connector, Plaintiff

contends,

> While Defendants take great care to emphasize the similarities and importance of these terms used in patent prosecution, conveniently missing from this exercise is an explanation of how the terms "tongue and groove" and "friction fit" used in Defendants own product specifications (Docs. 2-2, p.2; 35-5, p. 4) are in any way distinct from the same terms used in the '044 Patent claims and record.  To the extent that the terms "swage," "snap" and "friction" share certain features when used in the construction field, most notably, the use of a frictional force to obtain a secure fit, such similarities do not negate the presence of this type of connector in the VERSAWRAP.  Most certainly, the VERSAWRAP connector employs friction to maintain a male projection and corresponding female recess "connection."
>
> As if these reasons were not enough to show the presence of the claimed connector in the VERSAWRAP product, Defendants go so far as to admit that the product "utilizes the joint shown in figure 7" of the Encyclopedia reference.  *See* (Doc. 44, p. 6).  This same figure was also referenced by Defendant Wolfpac as illustrating a "virtually identical" connector to that "illustrated in Fig. 3 of the '044 Patent." *See* (Doc. 17, p. 7).  Taking Defendants['] assertions as true, they have in fact admitted the connectors of the VERSAWRAP product are the same as those claimed in the '044 Patent.

[Doc. 53 at 8.]  Plaintiff also argues the VERSAWRAP™ product includes slanted or

inclined surfaces along each interior surface, which are the claimed beveled edges, and

"[a]t most, the V-within a-V-groove in the VERSAWRAP product is an additional element,

rather than an altogether different element than the 'beveled' edges of the '044 Patent

claims."  [*Id.* at 9–10.]

Upon review, the Court concludes Plaintiff is likely to succeed on the merits of its

infringement claim.  Claims 17 and 19 read as follows:

8

17. A decorative wrap for a support, comprising:

plural segments, each segment of said plural segments having an exterior surface, an interior surface, and **opposing beveled edges on said interior surface**, said plural segments being arranged in adjacent relationship with respect to one another, said plural segments including **two opposing outermost segments each having a distal end with a face including a bevel**, said plural segments adapted to form an enclosure when said beveled edges of adjacent plural segments are brought into engagement and said distal ends of said outermost edges of said outermost segments are brought into engagement, wherein said outermost segments include a first configuration having a projection formed on said distal end of a first outermost segment and a second configuration having a corresponding recess formed on said interior surface adjacent to said distal end of a second outermost segment, **said projection and said recess adapted to form a swage fit between said first and second outermost segments when said distal ends are rotatably engaged to form said enclosure**, and wherein only said exterior surface of said outermost segments is exposed for a finished appearance of said enclosure as viewed from said exterior surface when said faces abut.

***

19. An enclosure, comprising:

plural segments, each segment of said plural segments having an exterior surface, an interior surface, and **opposing beveled edges on said interior surface**, said plural segments being arranged in adjacent relationship to one another, said plural segments including **two opposing outermost segments each having a distal end, each distal end having a face including a bevel**, said plural segments adapted to form an enclosure when said beveled edges of adjacent plural segments are brought into engagement and said faces of said distal ends of said outermost segments are brought into engagement; and

9

a first securement carried by said plural segments for holding said adjacent beveled edges together, **wherein said distal ends are configured to interlock to form a frictional fit through corresponding male and female connectors**, wherein said male and female connectors include at least one male connector formed on said distal end of one of said outermost segments and at least one corresponding female connector formed on said interior surface adjacent to said distal end of the other of said outermost segments, and wherein said at least one male connector and said at least one female connector are unexposed for a finished appearance of said enclosure as viewed from said exterior surface when said faces of said distal ends are brought into engagement and said at least one male and female connectors are forced together, forming said enclosure.

U.S. Patent No. 7,997,044 col. 7 l. 43–col. 8 l. 5, col. 8 ll. 32–59 (emphasis added).

*Beveled Edges Limitation*

The two claims have nearly identical limitations with respect to beveled edges; the claims require the interior surface of the plural segments to have opposing beveled edges and that each distal end have a face including a bevel.[7] Thus, contrary to Defendants' assertion, the claims' language does not require that the interior surfaces be joined by a 45° V-shaped notch[8]; rather, the claims' language requires only that the interior surfaces have opposing beveled edges. Further, the VERSAWRAP™ product's CAD drawings, one of which is reproduced below, reveal Defendants' product contains the limitation of Claims

---

[7] "A beveled edge refers to an edge of a structure that is not perpendicular to the faces of the piece. . . . A bevel is typically used to soften the edge of a piece either for safety, wear resistance, aesthetics, or to facilitate mating with another piece." Bevel, http://en.wikipedia.org/wiki/Bevel (last visited May 7, 2012).

[8] The specification of the '044 Patent describes how the Column Wrap may be made. U.S. Patent No. 7,997,044 col. 4, ll. 43–57. Specifically, the specification provides that, for four-sided columns, three notches are made in the panel, each notch formed by making an edge at 45° from the interior surface of the panel. *Id.* at ll. 48–51. However, the specification later states the angles of the beveled edges and lengths of the segments determine the shape of the column, *id.* at col 5., ll. 12–13; thus, the angle of the bevel will depend on the shape of the column to be formed. Therefore, the Court does not read the specification to limit the angle of the bevel to 45° as suggested by Defendants.

10

17 and 19 of plural segments with opposing beveled edges and distal ends with a face including a bevel:[9]



---

[9] In their sur-reply, Defendants argue,

> . . . Plaintiff has failed to offer any comparison of Defendants' VERSAWRAP product to the claims of the '044 Patent. Instead, Plaintiff's supposed infringement analysis merely compares the VERSAWRAP "product specification" and "artwork" to "the figures of the '044 Patent and the Provisional Application," "artwork used to depict Plaintiff's…products," and "the language used in the claims of the '044 Patent . . . ." [Doc. 53, at. 6.] Such comparisons VERSAWRAP are simply irrelevant to the determination of infringement.
>
> In fact, Plaintiff's analysis with respect to the VERSAWRAP product specifications accomplishes nothing more than to confuse the issue of infringement and create a smokescreen that diverts attention away from the fact that Plaintiff's averments of infringement are not based on a comparison of Defendants' actual product to the claims of the '044 Patent. The drawings reproduced in Plaintiff's memorandum do not accurately depict the VERSAWRAP product, as can easily be seen when viewing an actual product specimen. In addition to being insufficient, this blatant omission of such a comparison brings into question whether Plaintiff even has a physical sample of or has ever seen Defendants' VERSAWRAP product.

[Doc. 56 at 6–7 (emphasis in original) (footnote omitted).] With respect to Defendants' argument that the drawings Plaintiff reproduced in its memorandum failed to accurately depict Defendants' product, Defendants fail to acknowledge that, in its reply to Defendants' response in opposition, Plaintiff noted the drawings had apparently changed, and Plaintiff argued its position using the updated drawings. [See Doc. 53 at 9–11.] Moreover, Plaintiff represented at the hearing before the Court that it had purchased the VERSAWRAP™ product that utilizes internal joints in early 2011, and Plaintiff used the VERSAWRAP™ product that utilizes internal joints to demonstrate how the limitations of Claims 17 and 19 read on that product. Thus, the Court concludes the VERSAWRAP™ drawing included herein, which Defendants also use in their response in opposition to Plaintiff's motion [Doc. 44 at 6, 11], is an accurate representation of Defendants' allegedly infringing product.

[Doc. 44 at 6, 11; 4" X 4" VERSAWRAP, http://www.versatex.com/cads/4X4-VERSAWRAP.pdf (last accessed April 25, 2012).]  While Defendants' product also includes a tongue and miter configuration as part of the internal joints, this addition does not overcome the fact that the Claims 17 and 19 employ the term "comprising" and read on the VERSAWRAP™ product with respect to the opposing beveled edges limitation. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited claims."); *see also Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1347 (Fed. Cir. 2005) ("The addition of unclaimed elements does not typically defeat infringement when a patent uses an open transitional phrase such as 'comprising.'" (citing *Crystal Semiconductor*, 246 F.3d at 1348)).  Therefore, on the record before the Court, the Court concludes that, at a trial on the merits, Plaintiff would likely be able to demonstrate Defendants' product contains the beveled edges limitation of Claims 17 and 19 of the '044 Patent.

*Connector Limitation*

Claims 17 and 19 employ different language to describe the way the distal ends are held together when they are brought together.  Claim 17 requires a projection on one distal end and a recess on the other distal end, where the projection and recess are "adapted to form a swage fit between said first and second outermost segments when said distal ends are rotatably engaged to form said enclosure."  U.S. Patent No. 7,997,044 col. 7 l. 56–col. 8 l. 2.  Claim 19 requires that the distal ends be "configured to interlock to form a frictional fit through corresponding male and female connectors," where the male connector is

formed on one distal end and the female connector is formed on the other distal end.  *Id.*
at col. 8 ll. 46–53.

While Defendants argue their product employs a tongue and miter joint, which is not
the same as a swage fit joint or a friction fit joint[10] [Doc. 44 at 4–9], Defendants have failed
to explain how a tongue and miter joint differs from a swage fit or friction fit joint.  First,
Defendants assert their product utilizes a tongue and miter joint, which is a long recognized
wood working/furniture making technique for joining two members that is accomplished by
using cutting tools that have been on the market for several years.  [*Id.* at 6–7.]  Then, after
including examples of Plaintiff's use of "snapped" from the abstract and specification of the
'044 Patent and stating that Plaintiff equated the terms "snap fit," "swage fit," and "swage-
like frictional fit" in the '044 Patent [*id.* at 7–9], Defendants state, "As can be seen in the
figure of the VERSAWRAP™ product above, the joint employed in the product is not a
snap joint and, accordingly, does not infringe the asserted claims of the '044 patent" [*id.*
at 9].  However, Defendants' discussion provides no explanation of what a tongue and
miter joint is or how it differs from a swage fit or friction fit joint.

Further, comparing the VERSAWRAP™ figure referenced by Defendants [*id.* at 6,
11] to Claims 17 and 19, Defendants' product appears to contain the connector limitation
of Claims 17 and 19.  First, Defendants' product contains a projection on one distal end
and a recess on the other distal end, which may also be described as a male connector
on one distal end and a corresponding female connector on the other distal end.  Second,
it appears that, in assembling the VERSAWRAP™ product around a column, force must

_____

[10] Defendants apparently do not contest that the VERSAWRAP™ product has a projection and recess
or corresponding male and female connectors.  [*See* Doc. 44 at 4–9.]

13

be applied to the outermost segments to fit the ends together; Plaintiff argues this feature demonstrates the ends of the VERSAWRAP™ product are held together through a swage and/or frictional fit [*see* Doc. 35-1 at 12–14; Doc. 53 at 8]. As explained above, Defendants have merely asserted their product does not utilize a swage fit or a friction fit and have provided no explanation to support their position. As previously stated, "[a] preliminary injunction should not issue if an alleged infringer raises a substantial question regarding . . . infringement." *AstraZeneca*, 633 F.3d at 1050 (citing *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)). Without explaining how their product fails to meet every limitation of the asserted claims, i.e., why a tongue and miter joint fails to satisfy the claim limitation of a swage fit or friction fit, the Court cannot find Defendants have raised a substantial question regarding infringement. Further, at this stage of the litigation, Plaintiff's explanation of how Defendants' product contains every limitation of the asserted claims demonstrates that Defendants' infringement defense lacks substantial merit. Thus, on the record before the Court, the Court concludes that, at a trial on the merits, Plaintiff would likely be able to demonstrate Defendants' product contains the connector limitation of Claims 17 and 19 of the '044 Patent.

### *Validity*

Defendants have asserted a counterclaim requesting the '044 Patent be declared invalid [Doc. 45 at 19–20; Doc. 46 at 21–22] and have repeatedly argued the '044 Patent is invalid [Doc. 17 at 1–15; Doc. 44 at 13–15; Doc. 56 at 1–6]. Specifically, to establish the '044 Patent is invalid,[11] Defendants have presented several prior art references, including

---

[11] Defendants contend the '044 Patent is invalid, not that the asserted claims, Claims 17 and 19 of the '044 Patent, are invalid.

14

eight references under the category "Mechanical fastener with resilient projection and corresponding recess"; six references under the category "Faces include a bevel so that said mechanical fastener is unexposed for a finished appearance of said enclosure"; seven references under the category "Beveled edges of adjacent segments are brought into engagement forming an enclosure"; and two references under the category "Use of Tape Around Wrapped Configuration." [Doc. 17 at 6–14.[12]] Some references appear in multiple categories, although only one reference appears in all four categories—U.S. Patent No. 3,625,269 ("Holan").[13]  Defendants contend,

> As shown at length in the prior art cited by Wolfpac in its Response to Plaintiff's Motion for Temporary Restraining Order [Doc. 17], which is incorporated herein by reference, coverings for posts, columns and the like have existed for decades. Furthermore, the designing of a post cover and many other types of enclosures, such as speaker boxes, by milling cuts into a panel to define bevel-edged segments and then folding the segments together to form a closed figure has been performed for decades.  Additionally, joining two pieces of wood or other material together by use of an interlocking joint is well known in the art of woodworking and construction.  *See* Ernest Joyce, *Encyclopedia of Furniture Making* (1970) [Doc. 17-5] (attached as Exhibit 8).
>
> In the face of this overwhelming amount of prior art, very little of which was considered by the USPTO in granting the '044 Patent, Defendants respectfully submit that Plaintiff cannot meet its burden to show that its infringement claims will withstand Defendants' challenges to the validity and enforceability of the '044 Patent.

---

[12] Atlantic Forest was added as a defendant after Wolfpac presented the prior art references in its response in opposition to Plaintiff's motion for a TRO, Docket Entry 17.  However, because Defendants jointly responded to Plaintiff's motion for preliminary injunction and incorporated Wolfpac's earlier response to the TRO motion, the Court will consider the references as jointly put forward by Defendants.

[13] Two of the references, U.S. Patent No. 5,555,989 ("Moran") and U.S. Patent No. 3,539,425 ("Marburg"), were references cited by the patent examiner.

[Doc. 44 at 13–14 (footnote omitted).]  Plaintiff argues Defendants have failed to produce clear and convincing evidence that overcomes the presumption of validity and that the references Defendants have offered in support of their invalidity defense fail to describe all of the features of the asserted patent claims.  [Doc. 35-1 at 9–10; Doc. 53 at 11–13.]

In *Titan Tire*, the Federal Circuit addressed how a trial court should determine whether, on a motion for preliminary injunction, the patentee has shown it is likely to succeed at trial on the issue of validity.  566 F.3d at 1376–80.  The court summarized,

> While the evidentiary burdens at the preliminary injunction stage track the burdens at trial, importantly the ultimate question before the trial court is different.  As this court explained in *New England Braiding Co. v. A.W. Chesterton Co.*, the trial court "does not resolve the validity question, but rather must . . . make an assessment of the persuasiveness of the challenger's evidence, recognizing that it is doing so without all evidence that may come out at trial." 970 F.2d 878, 882–83 (Fed. Cir. 1992).  Instead of the alleged infringer having to persuade the trial court that the patent is invalid, at this stage it is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue.

*Id.* at 1377.  The court noted that, under *New England Braiding*, to prevail on the validity issue at the preliminary injunction stage, "'where the evidence presented in support of invalidity raises a substantial question, . . . the patentee must show that the alleged infringer's defense lacks substantial merit.'"  *Id.* (quoting *New England Braiding*, 970 F.2d at 883).  Because determining whether an invalidity defense lacks substantial merit requires balancing all of the evidence before the court, the trial court should consider both the alleged infringer's evidence of invalidity and the patentee's rebuttal evidence to determine whether there is a substantial question as to the patent's validity.  *Id.* at 1378

(quoting *New England Braiding*, 970 F.2d at 883).  The balance of the evidence favors the alleged infringer if "it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid."  *Id.* at 1379; *Amazon.com*, 239 F.3d at 1359 ("In resisting a preliminary injunction, . . . one need not make out a case of actual invalidity.  Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial.  The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself.").  If the trial court determines the balance favors the alleged infringer, then the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit, "there is a 'substantial question' concerning the validity of the patent . . . , [and] it necessarily follows that the patentee has not succeeded in showing it is likely to succeed at trial on the merits of the validity issue."  *Titan Tire*, 566 F.3d at 1379 (citing *New England Braiding*, 970 F.2d at 883).  The Federal Circuit concluded, "[T]here is no room for making the substantial question test a substitute or replacement for the established test for injunctions.  That test places the burden on the plaintiff to prove likelihood of success."  *Id.* at 1380.

Upon review of the evidence available at this stage in the litigation, the Court concludes there is not a substantial question regarding the validity of the '044 Patent, and thus, Plaintiff is likely to succeed on the merits of the validity issue.  To begin, Defendants have failed to fully articulate their invalidity argument; thus, the Court is left to guess at whether Defendants argue the '044 Patent was anticipated by the prior art or was obvious in light of the prior art.  Based on the phrasing of Defendants' argument, which is quoted

above, the Court assumes Defendants contend the invention claimed in the '044 Patent

was obvious.[14]  As the Supreme Court has explained the obviousness inquiry,

> While the ultimate question of patent validity is one of law,
> *Great A. & P. Tea Co. v. Supermarket Equipment Corp.*, [340
> U.S. 147, 155 (1950)], the [35 U.S.C. § 103] condition,
> [nonobviousness,] which is but one of three conditions, each
> of which must be satisfied, lends itself to several basic factual
> inquiries.  Under § 103, the scope and content of the prior art
> are to be determined; differences between the prior art and the
> claims at issue are to be ascertained; and the level of ordinary
> skill in the pertinent art resolved.  Against this background, the
> obviousness or nonobviousness of the subject matter is
> determined.  Such secondary considerations as commercial
> success, long felt but unsolved needs, failure of others, etc.,
> might be utilized to give light to the circumstances surrounding
> the origin of the subject matter sought to be patented.  As
> indicia of obviousness or nonobviousness, these inquiries may
> have relevancy.

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

Here, in addition to failing to state the basis of their invalidity argument, Defendants

have failed to demonstrate the prior art covers the asserted claims of the '044 Patent or

that the differences between the prior art and the asserted claims of the '044 Patent can

be resolved in a way that supports a determination that the asserted claims were obvious.

---

[14] A court may find a patent claim is anticipated in only limited circumstances:

> Anticipation is established if every element of a properly construed claim is
> present in a single prior art reference.  *See* [*Glaverbel Societe Anonyme v.
> Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995)];
> *see also PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566
> (Fed. Cir. 1996); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927
> F.2d 1565, 1576 (Fed. Cir. 1991).  "There must be no difference between
> the claimed invention and the reference disclosure, as viewed by a person
> of ordinary skill in the field of the invention."  *Scripps Clinic & Research
> Found.*, 927 F.2d at 1576.

*Biacore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 459 (D. Del.1999).  Because Defendants have not
attempted to show that every element of Claim 17 or 19 is present in one of the references Defendants cite,
the Court assumes Defendants are not asserting anticipation as the basis of their invalidity argument.

Further, as Plaintiff argues, a review of the references Defendants cite shows the references teach only discrete elements of Claims 17 and 19, and Defendants have failed to articulate why combining these references in a manner that would result in the invention covered by Claims 17 and 19 would have been obvious to a person having ordinary skill in the art.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (stating several factors may inform a court's determination of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue," where identifying an apparent reason would indicate the claimed invention is obvious)[15]; *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("When resolving an obviousness issue, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.'  Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references

---

[15] Over the years, the Federal Circuit created and applied the teaching, suggestion, or motivation ("TSM") test for obviousness.  Under the Federal Circuit's original conception of the TSM test, "a patent claim is only proved obvious if "some motivation or suggestion to combine the prior art teachings" can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art."  *KSR*, 550 U.S. at 407.  In *KSR*, the Supreme Court held the TSM test can provide a "helpful insight" with respect to obviousness but noted that its precedents made clear "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."  *Id*. at 418.  Thus, the TSM test may inform the obviousness inquiry but may not direct a result; rather, a court should

> look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art . . . to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.*

in the right way so as to achieve the result of the claims in suit.'" (citations omitted)); *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988) ("One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention.").

To illustrate the insufficiency of merely providing prior art references without articulating a reason for combining their teachings, the Court provides the following discussion of some of Defendants' cited references. The Holan reference is directed to a woodworking machine for grooving panels, generally at an angle of approximately 45º for four-sided cabinets, where one of the objects of the invention is to provide a new and improved machine for grooving panels that forms multiple grooves at one time. [Doc. 17-8; U.S. Patent No. 3,625,269 col. 1, ll. 29–33, 42–45.] Another reference, U.S. Patent Application 2002/139077 A1 ("Heckford"), is an application related to cribs, or packs, for a roof support for mining, tunneling, bridgework, and various kinds of buildings. [Doc. 17-7; U.S. Patent Application 2002/0139077 A1 col. 1, ¶ 0002.] The Moran reference is directed to plastic enclosures that can be stored and shipped as flat sheets but are capable of being folded up along flexible fold lines and locked together and are suitable for use as wall-mounted electrical component enclosures. [Doc. 17-6; U.S. Patent No. 5,555,989 col. 1, ll. 16–22.]

Another reference, U.S. Patent No. 4,009,887 ("Mackenroth"), is directed to a joint between two members that allows structural members to be joined at either a right angle or a straight angle, where each member has (1) ends beveled in opposite directions at an angle of 45º and (2) opposite long and short sides. [Doc. 17-3; U.S. Patent No. 4,099,887 col. 1, ll. 4–7, 49–54.] Additionally, U.S. Patent No. 3,557,840 ("Maybee"), is directed to

20

the preparation of rigid cellular plastic foam insulation, typically disposed on a hand deformable skin surface, for installation about cylindrical structures.  [Doc. 17-4; U.S. Patent No. 3,557,840 col. 1, ll. 3–7.]  While Defendants have demonstrated the elements of Claims 17 and 19 may be found separately in these numerous references, Defendants have failed to show the Court any reason why a person having ordinary skill in the art would combine particular elements from patents covering a woodworking machine, roof support cribs, plastic enclosures for electrical components, joints for structural members, and insulation for cylindrical structures in the fashion claimed by the '044 Patent.  Thus, the Court finds Defendants have failed to demonstrate any of the factors identified in *Graham* to establish the invention covered by Claims 17 and 19 of the '044 Patent was obvious.

Moreover, Plaintiff has identified secondary considerations that indicate the invention covered by Claims 17 and 19 was nonobvious.  *See Graham*, 383 U.S. at 17–18 (stating that a prima facie showing of obviousness may be rebutted by evidence of secondary considerations, such as the commercial success of the claimed invention).  For example, prior to the introduction on the market of the VERSAWRAP™ product, Plaintiff's product enjoyed great commercial success.  [Doc. 35-2 ¶ 15; Doc. 35-4 ¶¶ 4–5.] Additionally, Plaintiff has submitted the declarations of Chris McCarthy and Russell Johnson, Atlantic Forest employees at the time Plaintiff was prosecuting the '044 Patent, who stated the Column Wrap is novel, unique, distinctive, effective, cost-effective, desirable, commercially successful, and nationally recognized.  [Doc. 53-3.]  Other people familiar with the industry submitted similar declarations.  [*See* Doc. 35-2 at 11–12; Doc. 35-3 ¶ 3; Doc. 35-4 ¶ 4.]  Therefore, in light of the evidence presented on the issue of validity,

21

the Court concludes that, at a trial on the merits, Plaintiff would be likely to succeed on a challenge to the validity of Claims 17 and 19.[16]

**Irreparable Harm**

Under the preliminary injunction standard articulated in *Winter*, the plaintiff must demonstrate more than the possibility of irreparable harm; the plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." 555 U.S. at 22 (emphasis in original) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). "[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)). However, as the Federal Circuit has stated,

> While this court has repeatedly upheld the right of a patentee to a preliminary injunction and sometimes spoken of the possible inadequacy of money damages, there is no

---

[16] Defendants also argue the claims of the '044 Patent use terms such as "monolithic," "swage," and "frictional" that only appear in the claims—they do not appear in the specification and are not illustrated in the figures of the '044 Patent—which raises questions of validity under 35 U.S.C. §112. [Doc. 44 at 15.] Section 112 provides in pertinent part,

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. §112. The Court rejects Defendants' argument for two reasons: first, the claims at issue use the terms "swage" and "frictional," which the Court has determined are understood in the '044 Patent by their ordinary meaning; second, the term "monolithic" is not used in any of the allegedly infringed claims, and Defendants have not shown how the use of this term in a claim that is not at issue invalidates the entire patent.

> presumption that money damages will be inadequate in
> connection with a motion for an injunction pendente lite. Some
> evidence and reasoned analysis for that inadequacy should be
> proffered. *See, e.g.*, *H.H. Robertson Co. v. United Steel Deck,
> Inc.*, 820 F.2d 384, 390, 2 USPQ2d 1926, 1930 (Fed. Cir.1987)
> (patent owner emphasized "the few remaining years of patent
> life").

*Nutrition 21 v. U.S.*, 930 F.2d 867, 871–72 (Fed. Cir. 1991); *see also Hybritech Inc. v.
Abbott Labs.*, 849 F.2d 1446, 1456 (Fed. Cir. 1988) (basing grant of preliminary injunction
on ten factors that indicated the plaintiff would be irreparably harmed); *MicroAire Surgical
Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 636–39 (W.D. Va. 2010) (finding
no irreparable harm to goodwill when it was "logically and factually unclear" how
introduction of a competing product would injure the plaintiff's goodwill when plaintiff did
not demonstrate more than the potential for lost sales or give a reasonable basis for its
conclusion that its training programs would lose value); *Bushnell, Inc. v. Brunton Co.*, 673
F. Supp. 2d 1241, 1262–63 (D. Kan. 2009) (finding irreparable harm based on the plaintiffs
claims of loss of market share and price erosion because the plaintiffs provided evidence
that the asserted harms were incalculable and not compensable through money damages).

Here, Plaintiff argues Defendants' activities have irreparably harmed and will
continue to irreparably harm Plaintiff, causing Plaintiff to lose market share, customers,
business opportunities, and its reputation, as well as suffer price erosion and an inability
to establish a consistent and loyal customer base. [Doc. 35-1 at 16–25; Doc. 53 at 13–19.]
Plaintiff contends these harms are incalculable and immediately threatened. [Doc. 53 at
15–16.] Specifically, Plaintiff alleges the following:

- Prior to Defendants' infringing acts, Plaintiff enjoyed virtual market
exclusivity and a nearly 80% share of the basic column wrap market,

23

where "basic" column wraps are those that are not custom made or made to order. [Doc. 35-2 ¶ 15; Doc. 35-4 ¶ 5.] Since Defendants' infringing acts, Plaintiff's market share has been reduced to between 35 and 40%, as evidenced by a 50% decline in sales over the last five and a half months compared to the same time frame one year ago. [Doc. 35-2 ¶ 15.]

• Defendants are head-to-head competitors of Plaintiff, and the only column wrap products on the market are those manufactured by Plaintiff and those manufactured and sold by Defendants. [Doc. 35-2 ¶ 11; Doc. 35-3 ¶ 7.] Accordingly, sales by Defendants decrease Plaintiff's market share. [Doc. 35-1 at 18; Doc. 35-2 ¶ 11; Doc. 53 at 14.]

• Because of Defendants' lower-priced, infringing product, orders for Plaintiff's product have decreased and contracts are being lost. [Doc. 35-4 ¶¶ 6–7, 9.]

• Plaintiff has lost customers [Doc. 35-2 ¶¶ 2–3; *see* Doc. 5-2 ¶ 16; Doc. 35-2 ¶¶ 6–8] and faces the loss of other customers [*see* Doc. 35-2 ¶ 9; Doc. 35-4 ¶ 9; *see also* Doc. 35-3 ¶ 13 (explaining that, "[i]n this business, dealers are loyal to the distributors themselves rather than the product"); Doc. 35-4 ¶ 12 (same)].

• Because Plaintiff's customers for the most part sell products to their own customers, it is impossible to calculate Plaintiff's loss of market share through its lost customers introducing Defendants' infringing product to third-parties. [Doc. 53 at 15.]

• Because a new customer will likely become loyal to the manufacturer of the first purchased product [Doc. 35-3 ¶ 5], Plaintiff will also have difficulty in establishing a new customer base in the face of Defendants' lower-priced, infringing product [Doc. 35-1 at 22; Doc. 53 at 16].

• Defendants' infringing activities are preventing Plaintiff from enjoying exclusivity in the column wrap market; specifically, Plaintiff has been unable to enter into an exclusive agreement with a large manufacturer because of this litigation. [Doc. 35-2 ¶ 12; Doc. 35-3 ¶¶ 6, 8–9; Doc. 35-6 ¶¶ 3–5, 7.]

• Plaintiff has suffered and will suffer damage to its reputation and loss of business opportunities. [Doc. 35-1 at 23; Doc. 53 at 18.]

• Because of its loss of market share, Plaintiff faces a shutdown of its Column Wrap product line and perhaps other product lines. [Doc. 35-2 ¶ 17.]

Defendants contend Plaintiff cannot establish it is suffering irreparable harm because Plaintiff has failed to demonstrate it will suffer future harm that is not compensable through money damages. [Doc. 44 at 15–24; Doc. 56 at 8–13.] Defendants contend Plaintiff mischaracterizes the column wrap market, where there are more players than Plaintiff and Defendants. [Doc. 44 at 16; Doc. 56 at 10.] Further, Defendants argue that some loss of Plaintiff's market share is attributable to Plaintiff's own actions. [Doc. 44 at 19; Doc. 44-6 ¶ 9; Doc. 56 at 10.] Defendants also contend Plaintiff has offered no support for its argument with respect to price erosion, and there is no evidence that Defendants' product is offered at a lower price than Plaintiff's. [Doc. 44 at 20; Doc. 56 at 13; *see* Doc. 44-9 ¶¶ 12–13 ("When Atlantic began distributing Wolfpac's Versawrap, it was sold at the same price as Plaintiff's Wrap-n-Snap™. Today, Wolfpac's Versawrap is sold at the same price as when Atlantic began distributing it.").] Defendants further contend Plaintiff has retained other distributors of its product, any harm resulting from the alleged loss of a possible future exclusive agreement is purely speculative, and Plaintiff has lost customers for reasons other than the design of Defendants' product. [Doc. 44 at 21–23; Doc. 44-6 ¶ 9; Doc. 44-9 ¶ 14; Doc. 56 at 13.] Finally, Defendants argue Plaintiff's delay in bringing suit—six months after the issuance of its patent and eight months after learning of the accused product—counsels against injunctive relief. [Doc. 44 at 24; Doc. 56 at 9–10.]

Upon review of the parties' arguments and the evidence presented, the Court concludes Plaintiff has demonstrated it will suffer irreparable harm in the absence of a

preliminary injunction. Plaintiff has demonstrated it has suffered and will continue to suffer loss of market share, loss of business opportunities, and price erosion, which are types of harm that usually cannot be compensated through money damages, *see Multi–Channel*, 22 F.3d at 552; *Bushnell*, 673 F. Supp. 2d at 1262–63. First, Plaintiff has demonstrated it has suffered a loss of market share, which is likely to continue while Defendants' competing product is on the market.[17] [Doc. 35-2 ¶ 11 (averring Wolfpac and Plaintiff are head-to-head competitors for the manufacturer of column wraps with interlocking joints, such that each lost sale to Defendants deprives Plaintiff of its market share); Doc. 35-2 ¶ 15 (averring Plaintiff has lost half of its market share, as evidenced by a 50% drop in sales of its Column Wrap); Doc. 35-4 ¶ 6 (averring lost market share for product covered by the '044 Patent, evidenced by 25% loss in sales to dealer competing against dealers selling Defendants' product); *see* Doc. 35-3 ¶ 7 (averring Plaintiff's product has only one competing product, which is manufactured by Wolfpac); Doc. 35-3 ¶ 5, 10, 13 (averring a new column wrap user will be loyal to the first purchased product, but the product in the user's hands is determined by a distributor such as Atlantic Forest because the dealers selling the product are loyal to the distributor); Doc. 35-4 ¶ 12 ("In this industry, contractors and dealers are loyal to their suppliers or distributors rather than to brands. . . . Indeed, losing accounts to distributors on the basis of Wolfpac's pricing structure not only results in the loss of sales, but also in the loss of connection to the distributor's customer base.").]

---

[17] Defendants contend Plaintiff mischaracterizes the column wrap market by stating Plaintiff and Wolfpac are the manufacturers of the only Column Wrap product on the market; Defendant produced marketing materials of several other manufacturers of column wrap products. However, Plaintiff defined "Column Wrap" as the invention covered by the '044 Patent [Doc. 35-1 at 1–2], and Defendants have failed to demonstrate that the other column wrap products fit this definition of "Column Wrap." Thus, without more, the Court disagrees that Plaintiff has mischaracterized the state of the Column Wrap market.

Second, Plaintiff has demonstrated that it has lost business opportunities as a result of the introduction of the VERSAWRAP™ product. [Doc. 35-2 ¶ 12 (describing loss of exclusive license agreement with HB&G); Doc. 35-3 ¶¶ 6, 8–9 (same); Doc. 35-6 ¶¶ 5, 7 (same); Doc. 35-4 ¶ 9 (describing potential loss of customer Kleer).] Third, Plaintiff has demonstrated it has suffered price erosion because the VERSAWRAP™ product is sold at a lower price than Plaintiff's Column Wrap product.[18] [Doc. 35-2 ¶ 13 (averring Atlantic Forest's knowledge and use of internal pricing information enabled Wolfpac to set such low prices for the VERSAWRAP™ product that Plaintiff's product cannot compete in the market); Doc. 35-4 ¶¶ 7–9 (averring the VERSAWRAP™ product is sold at a lower price than the Column Wrap).]

Further, Plaintiff has demonstrated its losses are incalculable, and thus, money damages are inadequate. *See Nutrition 21*, 930 F.2d at 871–72 (stating that for a court to find money damages are inadequate, there must be some evidence of inadequacy). Significantly, Plaintiff's owner and co-inventor of the Column Wrap averred that because of its loss of market share, Plaintiff faces a shutdown of its Column Wrap product line and

---

[18] Defendants contend Plaintiff has failed to demonstrate price erosion because there is no evidence that Defendants offer the VERSAWRAP™ product at a lower price than Plaintiff's Column Wrap. To support this argument, Defendants submitted an affidavit that states, "When Atlantic began distributing Wolfpac's Versawrap, it was sold at the same price as Plaintiff's Wrap-n-Snap™. Today, Wolfpac's Versawrap is sold at the same price as when Atlantic began distributing it." [Doc. 44-9 ¶¶ 12–13.] The Court finds Defendants' argument unavailing; that the VERSAWRAP™ product was initially sold at the same price as the Column Wrap product and is now sold at the same price as when Atlantic Forest began distributing the VERSAWRAP™ product fails to show the VERSAWRAP™ product is not now sold at a lower price than the Column Wrap product. Further, contrary to Defendants' contention that Plaintiff has failed to demonstrate price erosion because there is no evidence the VERSAWRAP™ product is sold at a lower price than the Column Wrap product, Plaintiff has produced affidavits supporting its price erosion argument. Further, there is some evidence in the record of how the Column Wrap product and VERSAWRAP™ product's prices compare, showing the VERSAWRAP™ product is sold at lower prices. [Doc. 5-2 at 33.] Finally, in the face of Plaintiff's evidence that the VERSAWRAP™ product is the lower-priced product, Defendants have failed to put forth contradictory evidence. Thus, the Court disagrees with Defendants' contention regarding the sufficiency of the evidence.

27

perhaps other product lines.  [Doc. 35-2 ¶ 17.]  Further, without an injunction, Plaintiff has demonstrated it will lose at least one exclusive licensing deal, if not other contracts and sales.  [Doc. 35-2 ¶ 12 (describing loss of exclusive license agreement with HB&G; Doc. 35-3 ¶¶ 6, 8–9 (same); Doc. 35-6 ¶¶ 5, 7 (same); Doc. 35-4 ¶ 9 (describing potential loss of customer Kleer).]  Additionally, a financial advisor for Plaintiff submitted an affidavit averring that "[b]ecause of the commercialization of [Defendants'] competing and allegedly infringing product, the value and marketability of [Plaintiff's] business and product line is being reduced by an unknown amount."  [Doc. 35-6 ¶ 6.]  Therefore, based on the record before the Court, the Court concludes Plaintiff has adequately demonstrated that, without an injunction, it will likely suffer irreparable harm.[19]

**Balance of Equities**

In addition to determining the irreparable harm the plaintiff will suffer if the court does not issue a preliminary injunction, the reviewing court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987).  If the resulting balance favors the plaintiff, he is entitled to a preliminary injunction, provided he meets *Winter*'s three other requirements.  *See Winter*, 555 U.S. at 20.  Here,

---

[19] Defendants also argue Plaintiff's delay in bringing suit—six months after the issuance of its patent and eight months after learning of the accused product—counsels against injunctive relief.  [Doc. 44 at 24; Doc. 56 at 9–10.] Defendants seem to base their argument on the District Court's previous denial of Plaintiff's motion for injunction relief, arguing Plaintiff's delay is distinguishable from the plaintiffs' delay in *Bushnell*.  A review of this Court's February 6, 2012 Report and Recommendation and the District Court's Order adopting that Report and Recommendation and denying relief fails to reveal that either court distinguished *Bushnell* on the basis of the plaintiffs' delay in bringing suit.  [*See* Docs. 10, 28.]  Further, a review of the Report and Recommendation and Order reveals Plaintiff's motion was denied for Plaintiff's failure to demonstrate it would suffer future irreparable harm in the absence of injunctive relief.  [*See id.*]  Because Plaintiff has now adequately demonstrated that it stands to continue to suffer irreparable harm without a preliminary injunction, the Court finds Defendants' argument is meritless.

as described above, the Court has determined Plaintiff is likely to suffer irreparable harm absent a preliminary injunction, where the harm Plaintiff is likely to suffer includes the complete shutdown of the Column Wrap product line and possibly other product lines. [Doc. 35-2 ¶ 17.]  In contrast, Defendants argue a preliminary injunction would impair their relationships with their customers and make it difficult for Wolfpac to re-enter the market if the injunction were later lifted.  [Doc. 44 at 25; Doc. 56 at 14.]  Balancing the effects on each party of granting or withholding relief, the Court finds the balance tips in Plaintiff's favor, as Plaintiff has demonstrated the likelihood of substantial damage to its business in the absence of an injunction.

**Public Interest**

Finally, a court must "pay particular regard for the public consequences" in evaluating whether the plaintiff is entitled to a preliminary injunction. *Romero-Barcelo*, 456 U.S. at 312 (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).  "The possession and assertion of patent rights are 'issues of great moment to the public.'" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944)).  Enforcing a valid patent against an infringer by issuing a preliminary injunction furthers public policy inherent in the patent laws, which are designed to encourage useful inventions by allowing a patentee to enjoy a limited period of market exclusivity.  *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005) (quoting District of New Jersey's bench decision regarding grant of preliminary injunction).  On the other hand, "the public benefits from

lower prices resulting from free market competition," *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008), which may be hindered by an injunction.

In this case, the Court concludes a preliminary injunction would be in the public interest because the public has an interest in the enforcement of valid patents and the Court has found Plaintiff is likely to succeed on the merits with respect to infringement and validity.

### RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends Plaintiff's motion for preliminary injunction be GRANTED and that a preliminary injunction be issued enjoining Defendants, including their officers, agents, employees, attorneys, and others in privy with them, from infringing the '044 Patent. If this Report and Recommendation is adopted by the District Court, the Court also recommends that the preliminary injunction not issue until Plaintiff has posted a bond with the Clerk of Court in an amount to be determined after the parties have briefed the Court on the issue of the required amount of bond.[20]

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

May 9, 2012
Greenville, South Carolina

---

[20] With respect to the issue of bond, Defendants have failed to present any evidence of monetary damages—such as lost profits, advertising costs, and other expenses—they would sustain if a preliminary injunction was entered. It is not for this Court to speculate or to anticipate any damages that have not been presented or proven to the Court, but if a preliminary injunction is entered, a bond is necessary to secure reimbursement of Defendants' attorney's fees and costs that may be incurred in this litigation if Defendants prevail on the merits and/or the preliminary injunction is dissolved. Thus, briefing on the required amount of bond is necessary if the District Court agrees Plaintiff's motion for preliminary injunction should be granted.